IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CAROLYN MURPHY, | § | CIVIL ACTION NO. 2:15-cv-05566 |
| INDIVIDUALLY AND AS | § | |
| EXECUTRIX OF THE ESTATE | § | SECTION "N" (5) |
| OF ROBIN MURPHY, SR., | § | |
| IRVIN MURPHY, | § | DISTRICT JUDGE: |
| KELLY RICKS, | § | KURT D. ENGELHARDT |
| ROBIN MURPHY, JR., | § | |
| and | § | MAGISTRATE JUDGE: |
| APRIL ANN IRONS, | § | MICHAEL NORTH |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | |
| | § | |
| ALCATEL-LUCENT USA INC., | § | |
| FORMERLY KNOWN AS LUCENT | § | |
| TECHNOLOGIES, INC., | § | |
| AT&T CORP., FORMERLY KNOWN | § | |
| AS AMERICAN TELEPHONE AND | § | |
| TELEGRAPH COMPANY, | § | |
| BELLSOUTH | § | |
| TELECOMMUNICATIONS, LLC, | § | |
| CERTAINTEED CORPORATION, | § | |
| EATON CORPORATION, | § | |
| GRAYBAR ELECTRIC COMPANY, INC. | § | |
| HONEYWELL INTERNATIONAL INC., | § | |
| OCCIDENTAL CHEMICAL | § | |
| CORPORATION, | § | |
| PLASTICS ENGINEERING COMPANY, | § | |
| ROGERS CORPORATION, | § | |
| ROHM & HAAS COMPANY, | § | |
| SCHNEIDER ELECTRIC USA, INC., | § | |
| FORMERLY KNOWN AS SQUARE D | § | |
| COMPANY, | § | |
| and | § | |
| SPECIAL ELECTRIC COMPANY, INC. | § | |
| | § | |
| DEFENDANTS. | § | |

## PLAINTIFFS' FOURTH AMENDED COMPLAINT

NOW INTO COURT, through undersigned counsel, come Plaintiffs, CAROLYN MURPHY, Individually and as Executrix of the Estate of ROBIN MURPHY, SR., IRVIN MURPHY, KELLY RICKS, ROBIN MURPHY, JR., and APRIL ANN IRONS, (hereinafter referred to collectively as the "Plaintiffs"), complaining of Defendants, pursuant to Order and Reasons [Rec. Doc. 118] dated February 16, 2017, and would respectfully show the Court as follows:

### I.
### PARTIES & SERVICE

1.    Plaintiff CAROLYN MURPHY is a citizen and resident of the Eastern District of Louisiana.

2.    Plaintiff IRVIN MURPHY is a resident of Denmark.

3.    Plaintiff KELLY RICKS is a citizen and resident of the Eastern District of Louisiana.

4.    Plaintiff ROBIN MURPHY, JR. is a citizen and resident of the Eastern District of Louisiana.

5.    Plaintiff APRIL ANN IRONS is a citizen and resident of Arizona.

6.    Plaintiff-Decedent ROBIN MURPHY SR. was a citizen and resident of the Eastern District of Louisiana at the time of his death.

7.    Defendant ALCATEL-LUCENT USA INC., formerly known as Lucent Technologies, Inc., individually and as successor-in-interest to AT&T Technologies, Inc., and Western Electric Company, Inc., and for its Bell Labs unit, also known as Bell Laboratories, Inc., formerly known as AT&T Laboratories formerly known as AT&T Bell Laboratories, formerly known as Bell Laboratories, formerly known as Bell Telephone Laboratories (hereinafter

2

"Alcatel-Lucent") is a Delaware corporation with its principal place of business in New Jersey. Defendant was previously served in the underlying state-court action, consented to removal and answered Plaintiffs' First and Second Supplemental and Amending Petitions on December 3, 2015 (Rec. Doc. 9).

8.      Defendant AT&T CORP., formerly known as AMERICAN TELEPHONE AND TELEGRAPH COMPANY, individually and successor-in-interest to AT&T Laboratories formerly known as AT&T Bell Laboratories, formerly known as Bell Laboratories, formerly known as Bell Telephone Laboratories (hereinafter "AT&T") is a New York corporation with its principal place of business in New Jersey.  Defendant AT&T is the successor by merger to Western Electric Company, Inc. with AT&T being the surviving entity from the merger. Defendant was previously served in the underlying state-court action.   After being dismissed without prejudice by Plaintiffs' prior lead counsel, AT&T was re-named in Plaintiffs' First Supplemental and Amending Petition and re-served on or about September 29, 2015 (Rec. Doc. 5 -Volume 4, page 48 of 239).

9.      Defendant  BELLSOUTH  TELECOMMUNICATIONS,  LLC  (hereinafter "Bellsouth") is a Georgia corporation with its principal place of business in Georgia. Defendant was previously served in the underlying state-court action, consented to removal and answered Plaintiffs' First and Second Supplemental and Amending Petitions on December 15, 2015 (Rec. Doc. 14).

10.     Defendant CERTAINTEED CORPORATION (hereinafter "Certainteed") is a Delaware corporation with its principal place of business in Pennsylvania.  Defendant was previously served in the underlying state-court action and consented to removal.

11.     Defendant EATON CORPORATION, individually and as successor-in-interest to

3

Eaton Electrical, Inc. and Cutler-Hammer, Inc. (hereinafter "Eaton") is an Ohio corporation with its principal place of business in Ohio.  Defendant was previously served in the underlying state-court action and consented to removal.

12.     Defendant GRAYBAR ELECTRIC COMPANY, INC. (hereinafter "Graybar") is a New York corporation with its principal place of business in Missouri.  Defendant was previously served in the underlying state-court action, consented to removal and answered Plaintiffs' Original, First and Second Supplemental and Amending Petitions on December 17, 2016 (Rec. Doc. 33).

13.     Defendant HONEYWELL INTERNATIONAL INC., as successor-in-interest to Allied Chemical Corporation (hereinafter "Allied Chemical") is a Delaware corporation with its principal place of business in New Jersey.   Defendant was previously served in the underlying state-court action and consented to removal.

14.     Defendant OCCIDENTAL CHEMICAL CORPORATION, individually and as successor-in-interest to Durez Corporation (hereinafter "Occidental Chemical") is a New York corporation with its principal place of business in Texas.   Defendant was previously served in the underlying state-court action and consented to removal.

15.     Defendant PLASTICS ENGINEERING COMPANY (hereinafter "Plenco") is a Wisconsin corporation with its principal place of business in Wisconsin.  Defendant was previously served in the underlying state-court action and consented to removal.

16.     Defendant ROGERS CORPORATION (hereinafter "Rogers") is a Massachusetts corporation with its principal place of business in Connecticut.  Defendant was previously served in the underlying state-court action and consented to removal.

17.     Defendant ROHM & HAAS COMPANY (hereinafter "Rohm & Haas") is a

Delaware corporation with its principal place of business in Pennsylvania.  Defendant was previously served in the underlying state-court action and filed the Notice of Removal.

18.     Defendant SCHNEIDER ELECTRIC USA, INC., formerly known as Square D Company, (hereinafter "Square D") is a Delaware corporation with its principal place of business in Illinois.   Defendant was previously served in the underlying state-court action, consented to removal and answered Plaintiffs' Second Supplemental and Amending Petition on December 3, 2015 (Rec. Doc. 15).

19.     Defendant SPECIAL ELECTRIC COMPANY, INC. (hereinafter "Special Electric") is a Wisconsin corporation with its principal place of business in Wisconsin. Defendant was previously served in the underlying state-court action, consented to removal and answered Plaintiffs' Original, First and Second Supplemental and Amending Petitions on December 3, 2015 (Rec. Doc. 10).

## II.
## PROCEDURAL HISTORY, JURISDICTION AND VENUE

20.     ROBIN MURPHY, SR. filed his original Petition for Damages on April 13, 2012 in Civil District Court for the Parish of Orleans, Docket No. 12-3626.

21.     After ROBIN MURPHY, SR. died from complications of mesothelioma, Plaintiff CAROLYN MURPHY was added as a party in her First Supplemental and Amending Petition for Damages filed on August 14, 2015, which also included claims for Wrongful Death and Survival Action and added fifteen new defendants.   Service was requested for all new defendants and all but three of the original defendants who had previously settled.

22.     Plaintiffs IRVIN MURPHY, KELLY RICKS AND ROBIN MURPHY, JR. were added as parties in the Second Supplemental and Amending Petition for Damages filed on or about September 25, 2015.   No additional defendants were named.

23.   On October 29, 2015, the Orleans Parish action was removed to federal court by Defendant ROHM & HAAS based on the alleged complete diversity of the parties and alleged improper joinder of non-diverse parties (Rec. Doc. 1).

24.   On November 30, 2015, Plaintiffs filed their Motion to Remand (Rec. Doc. 7).

25.   On June 7, 2016, the Court denied Plaintiffs' Motion to Remand (Rec. Doc. 40).

26.   The Court has asserted jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(1) because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, excluding interests and costs.

27.   Venue is proper in this matter pursuant to 28 U.S.C. §1391(a)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Louisiana.

### III.
### SUMMARY OF FACTS

28.   Decedent ROBIN MURPHY, SR. was employed by Defendants BELLSOUTH and AT&T at various locations in and around New Orleans, Louisiana from 1964 to 2000.   Mr. Murphy worked in varying roles during his 37-year career for Defendants BELLSOUTH and AT&T, including, but not limited to, frameman, installer, switchman, foreman, electronics technician, and computer system maintenance technician.

a.   As a frameman, from approximately 1964 to 1965, Mr. Murphy was exposed to asbestos-containing products, including, but not limited to, asbestos gloves, switchboards, panel control board, switching equipment, asbestos impregnated resistors, relays, soldering wiping pads, impregnated asbestos composition panels, asbestos insulated wires, asbestos washers, asbestos covered cable, power panels, fuses, motor control units and phenolic molding compounds. All these materials would have been part

6

of either the safety gear provided, materials worked with or exposed to in daily operation, materials responsible for exposing Mr. Murphy to dust/particulate, or otherwise used/handled by Mr. Murphy during his time as frameman.  Mr. Murphy was also exposed to asbestos dust and fibers from construction in the office during this time.

      b.     As an installer, from approximately 1965 to 1966, Mr. Murphy was exposed to asbestos-containing products, including, but not limited to, circuit breakers, soldering wiping pads, asbestos insulated wires, asbestos impregnated resistors, asbestos insulation, asbestos sheetrock, asbestos roof tiles, power panels, and fuses. Mr. Murphy physically worked with these products while installing phone systems into new construction and old homes during this time period. Mr. Murphy would have used/handled or been otherwise exposed to these products and any associated dust/particulate.

      c.     As a switchman, from approximately 1966 to 1969, Mr. Murphy was exposed to asbestos-containing products, including, but not limited to, asbestos gloves, switchboards, panel control boards, switching equipment, power panels, fuses, relays, asbestos impregnated resistors, impregnated asbestos composition panels, soldering wiping pads, asbestos washers, asbestos covered cable, phenolic molding compounds, asbestos filters, cement conduit, asbestos-cable vault covers, asbestos cable bags/pillows, asbestos tape, small and large asbestos-containing circuit breakers, asbestos-braided sleeves, phenolized asbestos sheets, asbestos paper and mill board. Mr. Murphy would have been around these products, and any associated dust/particulate, while involved in the oversight construction as well as during the course of his own work as he was responsible for the maintenance of the phone system and its switches.

      d.     As a foreman, from approximately 1969 to 1975, Mr. Murphy was exposed

to asbestos-containing products, including, but not limited to, switchboards, panel control board, switching equipment, power panels, fuses, relays, asbestos impregnated resistors, impregnated asbestos composition panels, asbestos washers, soldering wiping pads, asbestos covered cable, asbestos-containing phenolic molding compounds, asbestos filters, cement conduit, asbestos cable vault covers, asbestos cable bags/pillows, asbestos tape, asbestos-braided sleeves, phenolized asbestos sheets, asbestos paper, mill board, and small and large asbestos-containing circuit breakers. Mr. Murphy would have been around these products, and any associated dust/particulate, while supervising/performing maintenance, training employees to perform maintenance, supervising and assisting with Western Electric's installations, and performing safety checks.

e.      As an electronics technician, from approximately 1976 to 1980, Mr. Murphy was exposed asbestos-containing products, including, but not limited to, switchboards, panel control board, switching equipment, power panels, fuses, relays, asbestos impregnated resistors, impregnated asbestos composition panels, asbestos washers, soldering wiping pads, asbestos covered cable, asbestos-containing phenolic molding compounds, asbestos filters, cement conduit, asbestos-cable vault covers, asbestos cable bags/pillows, asbestos tape, asbestos-braided sleeves, phenolized asbestos sheets, asbestos paper, mill board, and small and large asbestos-containing circuit breakers. Mr. Murphy would have been around these products, and any associated dust/particulate, while supervising/assisting with removal or maintenance as the systems were upgraded and overseeing the installation of new systems by Western Electric.

f.      As a computer system maintenance technician, from approximately 1980 to 2000, Mr. Murphy was exposed asbestos-containing products, including, but not limited

to, switchboards, panel control board, switching equipment, power panels, fuses, relays, asbestos impregnated resistors, impregnated asbestos composition panels, asbestos washers, soldering wiping pads, asbestos covered cable, asbestos-containing phenolic molding compounds, asbestos filters, cement conduit, asbestos-cable vault covers, asbestos cable bags/pillows, asbestos tape, asbestos-braided sleeves, phenolized asbestos sheets, asbestos paper, mill board, and small and large asbestos-containing circuit breakers. Mr. Murphy would have been around these products, and any associated dust/particulate, while supervising/assisting with removal or maintenance as the systems were upgraded and overseeing the installation of new systems by Western Electric.

29.   ROBIN MURPHY, SR. worked at numerous premises owned, leased and/or operated by Defendants BELLSOUTH and/or AT&T, including facilities located in Gretna (Hancock/Riverside office) and New Orleans (Lake Central office, White Hall office, Seabrook office, Michoud office, Chalmatte office, Pointe a La Hache office, Delacroix office, St. Bernard office, Yscloskey office, Metairie Road office, Kenner office, Poydras office, Mid-City office, Shrewsbury office, New Orleans office, and Hammond office). Mr. Murphy worked at the Riverside Central office buildings on Hancock Street from approximately 1964 to 1969.   Mr. Murphy then worked in the Lake Central office on Prentiss Avenue from approximately 1969 to 1970.   Next, Mr. Murphy was based in the White Hall office on Franklin Avenue from approximately 1970 to 1973.   However, Mr. Murphy floated between multiple office locations during this early 1970s time period, including White Hall office, Seabrook office, Michoud office, Chalmette office, Pointe a La Hache office, Delacroix office, St. Bernard office, and Yscloskey office.   Subsequently, Mr. Murphy worked at the Metairie Road office from 1973 to 1975.   Mr. Murphy was moved temporarily to the Kenner office where he worked from 1975 to

1976.   In 1976, Mr. Murphy briefly returned to the Metairie Road office.   Following this, Mr. Murphy once again drifted between several offices, including the White Hall office, Seabrook office, Metairie Road office, Poydras office, Mid-City office, and Shrewsbury office.   Mr. Murphy then worked at the New Orleans office from approximately 1980 to 1997.   During this time, Mr. Murphy also worked at all the previously listed office sites, as needed.   Finally, Mr. Murphy worked at the Hammond office from approximately 1997 to 2000, after which Mr. Murphy retired.

30.      In the early 1900s, Defendants AT&T and ALCATEL-LUCENT (then known as Western Electric) formed and co-owned Bell Laboratories which was the research and development arm of the Bell system.   Bell Laboratories was responsible for testing and approving asbestos-containing products.   Bell Laboratories also developed new technology that was released into the Bell telephone network and utilized by Western Electric and AT&T employees.

31.      Defendants ALCATEL-LUCENT and/or AT&T distributed and/or manufactured asbestos-containing products for use in decedent's work at BELLSOUTH and AT&T facilities, including, but not limited to:

(a)      **Impregnated Asbestos Composition Panels** – This product consisted of a mixture of asbestos and portland cement which was pressed into a hard, uniform panel and impregnated with an appropriate dielectric.   It was intended for use as a panel for electric switchboards. These panels ranged in size from less than 42 by 48 inches to greater than 48 by 96 inches.   This product was sometimes referred to as asbestos transite board and was machined by sawing, drilling, milling, grinding, using band saws, hole cutters, and hole saws in conjunction with Western Electric Manufacturing operations.   In Western Electric literature, this material is also

10

referred to as ebony power board and it was anticipated that it would be drilled by Western Electric technicians in central office environments. Western Electric tests reveal that the panels were 35 to 40 percent asbestos. Additional documentation established that transite was used in central offices for floor and wall openings and that it was eventually replaced by metal covers. There is also evidence that ebony boards were drilled in power rooms. Transite duct was used in conjunction with underground cable and on occasion was cut.

(b)  **Asbestos Paper and Mill Board** – Material specifications reflect that asbestos paper and mill board supplied to Western Electric should be principally asbestos fiber with a small amount of binding material. The mill board was to be supplied as "medium quality" suitable for shearing into strips and with a thickness over $1/8^{th}$ inch for drilling. The product was to be delivered either in rolls or in sheets of approximately 42 by 48 inches.

(c)  **Phenolic Molding Compounds** – This material was ordered by Western Electric Manufacturing and Bell Telephone Laboratories. Some compounds referenced bear the trade names of Defendants PLENCO, DUREZ, ROGERS and others. Phenolic molding compounds were defined by Western Electric Manufacturing as hot-molding thermos-setting compounds consisting essentially of a phenol-formaldehyde resin or a modification thereof intimately combined in the uncured or partially cured condition with fillers, pigments and dyes, as required. These compounds were intended for molding by compression, transfer, and in-line injection molding. Some of the applications were for spacers for cross-bar switches, electrical insulators, and wire-spring relays, terminal blocks and station protectors, diode bodies and connectors of various types. In July 1975, phenolic molding shops were using compounds that contained a substantial percentage of asbestos filler (20 to 25 percent by weight). OSHA inspections raised

concerns about shifting to a non-carcinogenic alternative and the failure of the company to provide medical exams to exposed employees.

1.      Mr. Murphy roles while employed by Western Electric required him to work with electrical products and components on a frequent and regular basis. Asbestos-containing phenolic molding compounds were present in components and boards used by Mr. Murphy and those around him. Mr. Murphy was exposed to asbestos dust and particulate that was released in the air when these products were manipulated, altered, sawed, drilled through, installed, and repaired by Mr. Murphy or those working under his supervision. These compounds were used on circuit boards, for glass works, in electrical resistors, as insulation, in switches, as circuits, and to mold for high resistance parts. The asbestos in these compounds was added for strength, insulation, or conductive purposes. During this manipulation and handling, the asbestos fibers impregnated in the compounds were released as dust/particulate which was breathed in and absorbed by the lungs. These asbestos-containing phenolic molding compounds were supplied either directly to Bellsouth and AT&T in raw or product form, or to Western Electric in raw and product form and installed in the offices of Bellsouth and AT&T.   Suppliers of asbestos-containing phenolic molding compounds to Western Electric included PLENCO, Durez, Rogers, Rohm & Haas, and Allied Chemical.[1]

2.      Defendant, Plastics Engineering Company, also known as PLENCO, produced asbestos-containing molding compound products as early as 1950.   These

---

[1] *See* Defendant Lucent Technologies Inc.'s Responses to Plaintiff's Supplemental Interrogatories and Requests for Product, at Supplemental Response to Interrogatory No. 1, *Taylor v. Bondex, Inc., et al.*, In the District Court of Harris County, Texas, 11th Judicial District, Cause No. 2006-19618.   A copy of the foregoing document will be made available upon request.

products were comprised of "varying formulas or percentages (by weight) of asbestos."[2] Further, PLENCO had patents for such asbestos-containing phenolic moldings compounds.[3]  During the 1960s and 1970s, Defendant held a large share of the U.S. market as a supplier of asbestos-containing phenolic molding compounds.  Therefore, Plastics Engineering Company, also known as PLENCO, was responsible for the manufacture of the asbestos-containing molding compounds during the relevant time period, along with other defendants. Mr. Murphy's exposure to these compounds was significant and this was a substantial factor in the development of his fatal mesothelioma.

3.      Defendant, Occidental Chemical Corporation, is the successor-in-interest to the Durez Division of Hooker Chemicals & Plastics Corporation.  Occidental Chemical Corporation states that Durez manufactured "thousands of different molding compounds with different chemical formulas."  Defendant admits that these molding compounds contained asbestos fillers.  Therefore, Occidental Chemical Corporation, as successor to Durez, was responsible for the manufacture of the asbestos-containing compounds during the relevant time period, along with other defendants. Mr. Murphy's exposure to these compounds was significant and this was a substantial factor in the development of his fatal mesothelioma.

4.      Defendant, Rogers Corporation, admits that the molding compound and phenolic resin products it manufactured contained asbestos.  Specifically, Rogers Corporation's "molding compound products were made with chrysotile asbestos fibers

---

[2] *See* Defendant Plastics Engineering Company's Objections, Answers, and Responses to Plaintiff's Interrogatories and Requests for Production, at Response to Interrogatory No. 1, *Bartlett v. A.W. Chesterton, Inc., et al.*, In the Circuit Court for the City of St. Louis, State of Missouri, Twenty-Second Judicial Circuit, Cause No. 1322-CC08968.   A copy of the foregoing document will be made available upon request.

[3] *See* U.S. Patent No. 3,922,241 (issued Nov. 25, 1975).   A copy of the foregoing document will be made available upon request.

encapsulated in a phenolic resin matrix."[4]  Additionally, Rogers Corporation is listed in the Modern Plastics Encyclopedia for the years 1974 to 1975. Thus, Rogers Corporation was responsible for the manufacture of the asbestos-containing compounds during the relevant time period, along with other defendants. Mr. Murphy's exposure to these compounds was significant and this was a substantial factor in the development of his fatal mesothelioma.

5.      Defendant, Rohm & Haas Company, is also listed in the same Encyclopedia of Modern Plastics released for the years 1974 to 1975. Additionally, Rohm & Haas Company is listed in the book *Polyester Molding Compounds* as one of the first to use a fiber based system to strengthen and control shrinkage of molding compounds. Rohm & Haas Company was responsible for the manufacture of the asbestos-containing compounds during the relevant time period, along with other defendants. Mr. Murphy's exposure to these compounds was significant and this was a substantial factor in the development of his fatal mesothelioma.

6.      Defendant, Honeywell International, Inc., as the successor-in-interest to Allied Chemical, has stated in memoranda that it manufactured asbestos-containing phenolic compounds. Further, Defendant holds patents for asbestos-containing compounds that relate to and are suited for electrical insulation.  The Allied Chemical patents reference fillers containing "asbestos…for the purposes of thermal conductivity, electrical insulating properties and hardness."[5]  Honeywell International, Inc., as the

---

[4] *See* Defendant Rogers Corporation's Responses to Plaintiff's Interrogatories and Requests for Production, at Response to Interrogatory No. 1, *McPherson v. John Crane, Inc., et al.*, In the Circuit Court, Third Judicial Circuit, Madison County, Illinois, Cause No. 12-L-1189.   A copy of the foregoing document will be made available upon request.
[5] *See* U.S. Patent No. 3,720,655 (issued Mar. 13, 1973); *see also* U.S. Patent No. 3,723,389 (issued Mar. 27, 1973). Copies of the foregoing documents will be made available upon request.

successor-in-interest to Allied Chemical, was responsible for the manufacture of the asbestos-containing compounds during the relevant time period, along with other defendants. Mr. Murphy's exposure to these compounds was significant and this was a substantial factor in the development of his fatal mesothelioma.

(d)     **Phenolized Asbestos Sheets** – Phenolized asbestos was manufactured by Western Electric by impregnating asbestos sheeting with a laminating varnish mixture that would then be cured and dried.   The manufacturing process involved use of saws, presses and buffing machines. The manufacturing process specifications recognize the potential for asbestos ruptures in the raw sheeting rolls and the need to scrape asbestos from curing ovens.   The process included using trim saws to trim the phenolized asbestos sheets to dimensions of 34 by 40 inches.   The semi-cured flexible sheets provided a wrap-around cover for resistor manufacture, which was then finally cured.   This material was also used in insulators.

(e)     **Asbestos-Braided Sleeving** – This material was ordered by Bell Telephone Labs and Western Electric Manufacturing and woven from asbestos fiber for use in fuses.   Some of the sleeving was manufactured with an outside diameter of 7/32nds of an inch and some with 5/64ths of an inch in diameter.   This material was to be supplied on spools with a head diameter of approximately 14 inches and with a length of 14 inches.

(f)     **Soldering Wiping Pads** – While Defendant ALCATEL-LUCENT advised that asbestos wiping pads used with old soldering irons were discontinued and scheduled for replacement in 1977, some were discovered in 1997 in New York.

(g)     **Asbestos Tape** – Tape and asbestos gloves were used in manufacturing operations involving molding glassware.

(h)     **Asbestos Washers** – Washers with inside diameters of .156 through .204 and outside diameter of .438 through .562 with thickness of .063 to .125 were manufactured by Western Electric.  These washers were made and stamped from sheets of asbestos material. Manufacturing was discontinued because of possible health concerns.  Employees may have been exposed to asbestos contained in washers during modification operations associated with step-by-step switches. Asbestos-type washers were replaced by mica-type washers beginning in 1978.

(i)     **Wires** – This wire consisted of a solid or braided strand with insulation with a closely woven braid, including a layer of asbestos fiber and an outer cotton braid that was lacquered.  This wire was sold and came in numbers (gauge) 22, 20, 18, 16, 14, 12 and 10 and was available in singles, pairs, triples and quads or other combinations and finished in various colors designated by colored tracers in the braid.  Conductor size 22 was associated with seven strands.  Conductor size 10 was associated with 105 strands.  Other conductor sizes ranged from seven to 105 strands.  Certain wires were associated with asbestos fiber and replaced around 1971 or 1972.

(j)     **Asbestos-Covered Cable** – Certain cable sheathed in asbestos braid has been identified as asbestos-type wire.

(k)     **Cable Bags/Pillows** – Asbestos cable hole bags are referred to in a 1974 memo referencing the cancellation of certain cable bags.  This may refer to what have otherwise been called asbestos bags or asbestos pillows, sometimes also referred to as blue pillows.

(l)     **Asbestos-Cable Vault Covers** – In 1973, a field trial was performed to sample asbestos particle size and concentrations for all standard conditions (tools, etc.) that an installer is exposed to when cutting transite (asbestos cement) cable hole covers.  The study noticed in some

16

instances the airborne fiber count was in excess of OSHA requirements.   Effective September 1, 1974, it was determined that all orders shipped from Western Electric required the substitution steel plates for transite to cover new cable holes.

(m)   **Cement Conduit** – An Outside Plant Products Manual dated October 18, 1978 and created by Western Electric references conduit running between manholes.   That manual also references fiber-cement conduit, which may be used singly or stacked for multi-duct installations. The materials note that the fiber cement-conduit is prone to breakage.   The specified material is cement with asbestos fiber.   This material is also in a drawing of a cable vault in a central office and makes reference to the need to fire-stop holes or slots.

(n)   **Asbestos Filters** – These filters were used in copper-plating solutions and were used in Western Electric locations.   This product contained 90% diatomaceous earth and 10% asbestos fiber.

(o)   **Flat Resistors** – An October 14, 1975 memo from Bell Laboratories references #18 and #19 wirewound resistors and health hazards from phenolized asbestos insulator.   These resistors had been utilized since 1957 and between 7 and 13 million were produced during this time period.   It is noted in a practice manual of Defendant AT&T that these resistors contained impregnated woven asbestos wrappings or impregnated asbestos cards.   Defendant AT&T acknowledges that these resistors may release asbestos fibers if crushed, cut or shattered.   A December 9, 1997 report from the environmental consultants used by Defendant ALCATEL-LUCENT refers to the analysis of certain samples containing from 35-40% chrysotile.

(p)   **Gloves** – A December 1978 recommendation from Defendant AT&T to Building Operating Staff Heads introduces new heat and fire retardant gloves and calls for the removal of certain asbestos gloves.   As of that time, asbestos gloves were located at each extinguishing

station in central office equipment areas.  Defendant AT&T anticipated a three-year period to replace asbestos gloves.

32.     Employees of Defendants ALCATEL-LUCENT and/or AT&T installed, repaired and maintained the aforementioned asbestos-containing products and equipment utilized at Defendants BELLSOUTH and AT&T facilities while ROBIN MURPHY, SR. was working nearby.

33.     Defendant ALCATEL-LUCENT and/or AT&T controlled the actions of their employees with respect to matters relating to safety, product design and equipment specifications.

34.     ROBIN MURPHY, SR. was exposed to asbestos-containing products, asbestos-containing dust, and/or asbestos while performing his normal duties as a BELLSOUTH and AT&T employee.   As a result of his exposure to asbestos-containing products, asbestos-containing dust, and/or asbestos while employed by BELLSOUTH and AT&T, Mr. Murphy contracted asbestos-related mesothelioma, which ultimately took his life on August 14, 2014.

35.     ROBIN MURPHY, SR. was exposed to asbestos dust and/or fibers while performing his normal duties and came in contact with the asbestos-containing products manufactured, sold, designed, supplied, distributed, mined, milled, relabeled, resold, processed, applied or installed by Defendants ALCATEL-LUCENT, AT&T, CERTAINTEED, EATON, GRAYBAR, ALLIED CHEMICAL, OCCIDENTAL CHEMICAL, PLENCO, ROGERS, ROHM & HAAS, SQUARE D and SPECIAL ELECTRIC, which were a cause of Robin Murphy Sr.'s asbestos-related mesothelioma.

36.     ROBIN MURPHY, SR. was exposed to asbestos dust and/or fibers while performing his normal duties and came in contact with asbestos-containing products supplied, distributed, applied, installed, removed, or manipulated by Defendants ALCATEL-LUCENT, AT&T, CERTAINTEED, EATON, GRAYBAR, ALLIED CHEMICAL, OCCIDENTAL CHEMICAL, PLENCO, ROGERS, ROHM & HAAS, SQUARE D and SPECIAL ELECTRIC, which were a cause of Robin Murphy Sr.'s asbestos-related mesothelioma.

37.     Defendant CERTAINTEED manufactured asbestos-containing roofing shingles that were cut and installed while ROBIN MURPHY, SR. worked nearby framing residential homes in Algiers, Louisiana and surrounding areas between 1966 and 1969.

38.     Defendant EATON manufactured and/or sold asbestos-containing circuit breakers installed, repaired and removed at Defendant BELLSOUTH facilities while ROBIN MURPHY, SR. was working nearby.

39.     Defendant GRAYBAR manufactured and/or distributed asbestos-containing electrical supplies and equipment for Defendant ALCATEL-LUCENT and/or AT&T.

40.     Defendant ALLIED CHEMICAL manufactured and/or supplied asbestos-containing phenolic molding compounds to Defendant ALCATEL-LUCENT and/or AT&T.

41.     Defendant OCCIDENTAL CHEMICAL manufactured and/or supplied asbestos-containing phenolic molding compounds to Defendant ALCATEL-LUCENT and/or AT&T.

42.     Defendant PLENCO manufactured and/or supplied asbestos-containing phenolic molding compounds to Defendant ALCATEL-LUCENT and/or AT&T.

43.     Defendant ROGERS manufactured and/or supplied asbestos-containing phenolic molding compounds to Defendant ALCATEL-LUCENT and/or AT&T.

44.     Defendant ROHM & HAAS manufactured and/or supplied asbestos-containing phenolic molding compounds to Defendant ALCATEL-LUCENT and/or AT&T.

45.     Defendant SQUARE D manufactured and/or sold asbestos-containing circuit breaker boxes installed, repaired and removed at Defendant BELLSOUTH facilities while ROBIN MURPHY, SR. was working nearby.

46.     Defendant SPECIAL ELECTRIC manufactured and/or supplied asbestos-containing fibers to Defendant CERTAINTEED.

47.     Each of the Defendants knew or should have known through industry and medical studies, the existence of which were unknown to ROBIN MURPHY, SR., of the health hazards inherent in the asbestos-containing products they were selling and/or using.   Instead of warning ROBIN MURPHY, SR. and the general public about these dangers, the defendants ignored or actively concealed such information, or condoned such concealment, in order to sell asbestos or asbestos-containing products and to avoid litigation by those who were injured from asbestos inhalation.   Those Defendants who have engaged in intentional misconduct, fraud or concealment or conspiracy to defraud or conceal the dangers of asbestos-containing products are specifically set forth and their conduct specifically described hereinafter in the section which, in addition to negligence or strict liability, identifies other forms of specified misconduct as set out herein and similarly identified by name of the particular defendant above the specific counts of misconduct.

48.     Plaintiff CAROLYN MURPHY is the surviving wife of ROBIN MURPHY, SR. and the Independent Executrix of her husband's estate.

49.     Plaintiffs IRVIN MURPHY, KELLY RICKS, ROBIN MURPHY, JR. and APRIL ANN IRONS are the only surviving children of ROBIN MURPHY, SR.

## IV.
## NEGLIGENCE OF EMPLOYER DEFENDANTS

50.     Plaintiffs incorporate herein each allegation set forth above.

51.     Plaintiffs allege negligent conduct and misconduct on behalf of Robin Murphy Sr.'s employer, Defendants BELLSOUTH and AT&T, in failing to provide and/or ensure a safe workplace for their employees, free of hazardous concentrations of asbestos-containing dust and/or asbestos; in failing to train BELLSOUTH and AT&T employees in asbestos safety measures, in order to reduce and/or prevent asbestos exposures to themselves and others; and in failing to inform their employees of the dangers, hazards, and/or risks of asbestos-containing products, asbestos-containing dust, and/or asbestos, in order to reduce and/or prevent asbestos exposures.

52.     ROBIN MURPHY, SR. was employed by Defendants BELLSOUTH and AT&T and during such employment was exposed to asbestos-containing products, asbestos-containing dust, and/or asbestos without the provision of appropriate safeguards by BELLSOUTH and/or AT&T.

53.     Defendants BELLSOUTH and AT&T undertook and assumed the duties and responsibilities owed individually and/or delegated to them for providing ROBIN MURPHY, SR. with a safe place to work and negligently failed to provide ROBIN MURPHY, SR. a safe place to work.

54.     Defendants BELLSOUTH and AT&T was responsible for providing ROBIN MURPHY, SR. with proper supervision, safety instruction, information concerning dangers, hazards, and/or risks in the workplace, and generally to provide ROBIN MURPHY, SR. a safe

workplace and to protect ROBIN MURPHY, SR.'s life, health, safety and welfare while employed by Defendants. Plaintiffs allege that the Defendants BELLSOUTH and AT&T had the following responsibilities and duties:

(a)     to provide its employees, including ROBIN MURPHY, SR., with a safe place to work;

(b)     to provide its employees, including ROBIN MURPHY, SR., with respirators to reduce or prevent their asbestos exposures;

(c)     to isolate work with asbestos-containing products, in order to reduce or prevent asbestos exposure to other BELLSOUTH and AT&T employees, including ROBIN MURPHY, SR.;

(d)     to inform BELLSOUTH and AT&T employees, including ROBIN MURPHY, SR., of the dangers, hazards, and risks of asbestos-containing products, asbestos-containing dust, and/or asbestos, in order to reduce or prevent their asbestos exposures;

(e)     to protect BELLSOUTH and AT&T employees, including ROBIN MURPHY, SR., from asbestos exposures;

(f)     to wet down asbestos-containing products, in order to reduce or prevent asbestos exposures to BELLSOUTH and AT&T employees, including ROBIN MURPHY, SR.;

(g)     to comply with all applicable Louisiana and U.S. laws and regulations regarding workplace exposure to asbestos;

(h)     to implement control measures to reduce or prevent BELLSOUTH and AT&T employees' exposures to asbestos in the work place;

(i)     to train BELLSOUTH and AT&T employees in asbestos safety measures, in order to reduce or prevent asbestos exposures;

(j)     to provide BELLSOUTH and AT&T employees with safety equipment adequate to reduce or prevent asbestos exposures;

(k)     to supervise and ensure compliance with all applicable asbestos safety regulations and guidelines, in order to reduce or prevent BELLSOUTH and AT&T employees' asbestos exposures;

(l)     to train, educate, and inform BELLSOUTH and AT&T employees, including ROBIN MURPHY, SR., of the dangers, hazards, and risks of asbestos-containing products, asbestos-containing dust, and/or asbestos;

(m)     failing to implement and enforce safety guidelines to reduce or prevent asbestos exposures to BELLSOUTH and AT&T'S employees, including ROBIN MURPHY, SR.; and

(n)     to properly hire, delegate, train, administer, and/or supervise employees to be in charge of providing BELLSOUTH and AT&T'S employees, including ROBIN MURPHY, SR., with a safe workplace.

55.     Defendants BELLSOUTH and AT&T and/or their predecessors-in-interest, subsidiaries, or successors-in-interest, individually and/or in concert, breached their duty of ordinary care to ROBIN MURPHY, SR. by negligently hiring, delegating, training, administering, supervising and performing duties owed individually and/or delegated to them, or failing to hire, delegate, train, administer, supervise or perform their duties owed individually and/or delegated to them directly and proximately causing the asbestos-related injuries, illnesses, disabilities, and death of ROBIN MURPHY, SR. The Defendants and/or their predecessors-in-interest, subsidiaries, or successors-in-interest were negligent in one, some and/or all of the following respects, among others, same being the proximate cause of ROBIN MURPHY, SR.'s asbestos-related injuries, illnesses, disabilities, and death:

23

(a)      failing to provide its employees, including ROBIN MURPHY, SR., with a safe place to work;

(b)      failing to provide its employees, including ROBIN MURPHY, SR., with respirators to reduce or prevent their asbestos exposures;

(c)      failing to isolate work with asbestos-containing products, in order to reduce or prevent asbestos exposure to other BELLSOUTH and AT&T employees, including ROBIN MURPHY, SR.;

(d)      failing to inform BELLSOUTH and AT&T employees, including ROBIN MURPHY, SR., of the dangers, hazards, and risks of asbestos-containing products, asbestos-containing dust, and/or asbestos, in order to reduce or prevent their asbestos exposures;

(e)      failing to protect BELLSOUTH and AT&T employees, including ROBIN MURPHY, SR., from asbestos exposures;

(f)      failing to wet down asbestos-containing products, in order to reduce or prevent asbestos exposures to BELLSOUTH and AT&T employees, including ROBIN MURPHY, SR.;

(g)      failing to comply with all applicable Louisiana and U.S. laws and regulations regarding workplace exposure to asbestos;

(h)      failing to implement control measures to reduce or prevent BELLSOUTH and AT&T employees' exposures to asbestos in the work place;

(i)      failing to train BELLSOUTH and AT&T employees in asbestos safety measures, in order to reduce or prevent asbestos exposures;

(j)      failing to provide BELLSOUTH and AT&T employees with safety equipment adequate to reduce or prevent asbestos exposures;

(k)      failing to supervise and ensure compliance with all applicable asbestos safety regulations and guidelines, in order to reduce or prevent BELLSOUTH and AT&T employees' asbestos exposures;

(l)      failing to train, educate, and inform BELLSOUTH and AT&T employees, including ROBIN MURPHY, SR., of the dangers, hazards, and risks of asbestos-containing products, asbestos-containing dust, and/or asbestos;

(m)      failing to implement and enforce safety guidelines to reduce or prevent asbestos exposures to BELLSOUTH and AT&T'S employees, including ROBIN MURPHY, SR.; and

(n)      failing to properly hire, delegate, train, administer, and/or supervise employees to be in charge of providing BELLSOUTH and AT&T'S employees, including ROBIN MURPHY, SR., with a safe workplace.

56.      The negligence of Defendants BELLSOUTH and AT&T was a substantial factor and contributed in causing ROBIN MURPHY, SR. to contract the asbestos-related mesothelioma which took his life.

57.      WHEREFORE, Plaintiffs pray judgment against Defendants BELLSOUTH and AT&T in a fair and reasonable amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with costs herein expended, and for any further relief this Court deems just and proper.

## V.
## STRICT LIABILITY AND NEGLIGENCE OF
## PREMISE DEFENDANTS AND THEIR EXECUTIVE OFFICERS

58.      Plaintiffs further allege strict premise liability of the Defendants BELLSOUTH and AT&T in failing to provide ROBIN MURPHY, SR. a safe place in which to work free from the hazards of asbestos, which failure was a proximate cause of ROBIN MURPHY, SR.'s injuries.

59.     The premises within which ROBIN MURPHY, SR. was personally exposed to asbestos were owned by and in the custody of Defendants BELLSOUTH and AT&T and was unreasonably dangerous due to the presence and use of asbestos and asbestos-containing products with little or no precautions taken to minimize the risk of exposure and absolutely no warning of that risk.  This unreasonably dangerous condition was a direct and proximate cause of ROBIN MURPHY, SR.'s injuries set forth herein.

60.     Defendants BELLSOUTH and AT&T negligently, recklessly, willfully and/or because of gross and wanton negligence, fault, or strict liability, failed to properly discharge its duties to ROBIN MURPHY, SR. in the following particulars:

(a)     failure to provide a safe place to work;

(b)     failure to provide adequate engineering or industrial hygiene measures to control the level of exposure to asbestos, including but not limited to local exhaust, general ventilation, respiratory protection, segregation of work involving asbestos, use of wet methods to reduce the release of asbestos into the ambient air, medical monitoring, air monitoring, and procedures to prevent the transportation of asbestos fibers home on ROBIN MURPHY, SR.'s clothing; and

(c)     failure to inform or warn of the hazards of asbestos exposure.

61.     These specific acts of fault were a substantial contributing factor of ROBIN MURPHY, SR.'s injuries.

## VI.
## STRICT LIABILITY OF MINER/MANUFACTURER/SELLER/SUPPLIER/ DISTRIBUTOR/CONTRACTOR DEFENDANTS

62.     Plaintiffs incorporate herein each allegation set forth above.

63.     The Defendants ALCATEL-LUCENT, AT&T, CERTAINTEED, EATON, GRAYBAR, ALLIED CHEMICAL, OCCIDENTAL CHEMICAL, PLENCO, ROGERS,

26

ROHM & HAAS, SQUARE D and SPECIAL ELECTRIC, were all miners, manufacturers, sellers, users, distributors contractors, and/or suppliers of asbestos products and were engaged in the business of using, manufacturing or facilitating the manufacture of asbestos products, or representing themselves as manufacturers of asbestos products, or were professional vendors of asbestos or asbestos-containing products, which were expected to and did reach, including but not limited to, each of the BELLSOUTH and AT&T facilities identified in Paragraph 29 and new home construction identified in Paragraph 37 from which ROBIN MURPHY, SR. was exposed.

64.     The products mined, manufactured, sold, distributed, supplied and/or used by these defendants were defective, unreasonably dangerous, and unreasonably dangerous per se, to ROBIN MURPHY, SR. who was an intended and foreseeable user and bystander who was exposed to these products.   These defects include, without limitation, the following:

(a)     the mining, manufacture, sale, supply, distribution and use of products that are unreasonably dangerous, or unreasonably dangerous per se;

(b)     the mining, manufacture, sale, supply, distribution and use of products that possess inherent and known properties that make them unreasonably dangerous by presenting high potential for causing serious injury, such as respiratory disease, cancer, and other health problems to the Plaintiff who would be foreseeably exposed to them in as a result of their intended use;

(c)     lack of warning or of sufficient warning of the hazards these products would present in the course of their normal foreseeable use or intended use;

(d)     lack of safety instructions or of sufficient safety instructions for eliminating or reducing the health risks associated with the intended use of these products;

(e)     failure of defendants to inspect these products to assure sufficiency and adequacy

27

of warnings and safety cautions;

(f)     failure to test or adequately test these products for defects or hazards they could present to the intended or foreseeable users;

(g)     failure to truthfully report or adequately report the results of product testing and medical studies associated with foreseeable hazards of these products by intended or foreseeable users;

(h)     failure to properly design these products when the nature of the product did not require use of asbestos mineral or where alternate, equally suitable substances were readily available;

(i)     defects in the composition and construction of these products;

(j)     failure to recall these products mined, manufactured, sold, distributed and/or supplied;

(k)     failure to properly package these products so that they could be safely transported, handled, stored or disposed of;

(l)     overwarranting the safety of these products that were manufactured, sold, supplied and/or used by Defendants; and

(m)     liability to Plaintiffs in strict liability for things in their garde, possession, custody or control, pursuant to article 2317 of the Louisiana Code of Civil Procedure that have caused harm to ROBIN MURPHY, SR.

65.     The defective conditions of defendants' products and fault, as noted above, are a proximate cause of ROBIN MURPHY, SR.'s injuries complained of herein.

66.     Plaintiffs also allege that each and every one of the foregoing defendants were also negligent in engaging in the substandard conduct enumerated above and that this negligence

was also a proximate cause of ROBIN MURPHY, SR.'s injuries.

## VII.
## DISCOVERY RULE

67.    Plaintiffs hereby invoke the discovery rule and would show unto the court that ROBIN MURPHY, SR. did not know he had an asbestos-related disease nor should he have known he had an asbestos-related disease prior to one year before filing his original Petition for Damages.

## VIII.
## DAMAGES

68.    Plaintiffs incorporate herein each allegation set forth above.

69.    The conduct of Defendants, as alleged hereinabove, was a direct, proximate and producing cause of the damages resulting from the asbestos-related lung disease, other related physical conditions, and the death of ROBIN MURPHY, SR. Plaintiffs have been damaged in the following non-exclusive particulars:

(a)    Prior to his death, ROBIN MURPHY, SR. suffered great physical pain and mental anguish due to his disease;

(b)    Prior to his death, ROBIN MURPHY, SR. incurred hospital and/or medical and/or pharmaceutical and/or other expenses due to his asbestos-related lung disease and other related physical conditions from which he suffered.

(c)    Prior to his death, ROBIN MURPHY, SR. suffered a physical impairment due to the disabling character of asbestos-related lung disease and other related physical conditions;

(d)    Prior to his death, ROBIN MURPHY, SR. suffered a permanent partial disability due to the progressive character of asbestos-related lung disease and other related physical conditions;

29

(e)      Prior to his death, ROBIN MURPHY, SR. required domestic help and nursing care due to his disabilities and was required to pay for such domestic help and nursing services; and

(f)      Prior to the onset of his symptoms, ROBIN MURPHY, SR. was active and participated in numerous hobbies and activities, and as a result of his illness, ROBIN MURPHY, SR. was prevented from engaging in some of said activities which were normal to him prior to developing symptoms from asbestos-related lung disease.   ROBIN MURPHY, SR. was prevented from participating in and enjoying the benefits of a full and complete life.

70.      WHEREFORE, PREMISES CONSIDERED, Plaintiffs prays that the Defendants answer herein, and that upon final trial the Plaintiffs has judgment against the Defendants and recover damages from the Defendants, in the total sum of their damages, actual and exemplary, in an amount greatly in excess of the minimal jurisdictional limits of the Court, plus costs of court, pre-judgment and post-judgment interest allowed by Louisiana law, and for such other and further relief, general and special, legal and equitable, to which the Plaintiffs may show themselves to be justly entitled. Plaintiffs further prays that there be judgment against these Defendants in a sum sufficient to compensate Plaintiffs for the following:

(a)      all past, present and future medical costs or expenses related thereto;

(b)      all past and present physical pain and suffering;

(c)      all past and present mental suffering, anguish, and pain;

(d)      loss of consortium, love, affection, services and society;

(e)      loss of quality of life; and

(g)      All other forms of relief provided by law or equity together with legal interest from the date of judicial demand until paid, plus costs of these proceedings.

71.    WHEREFORE, Plaintiffs pray judgment against Defendants in a fair and reasonable amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with costs herein expended, and for any further relief this Court deems just and proper.

72.    Please take notice that, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demands a jury trial in this action.

Respectfully submitted,

**LANDRY & SWARR LLC**

/s/ *Philip C. Hoffman*
**MICKEY P. LANDRY (#22817)**
**FRANK J. SWARR (#23322)**
**PHILIP C. HOFFMAN (#32277)**
**MATTHEW CLARK (#31102)**
**AMANDA J. BALLAY (#28630)**
1010 Common Street, Suite 2050
New Orleans, Louisiana 70112
Telephone: (504) 299-1214
Facsimile: (504) 299-1215

**BAILEY PEAVY BAILEY COWAN &**
**HECKAMAN PLLC**

/s/ *Aaron M. Heckaman*
**AARON M. HECKAMAN**, admitted *pro hac vice*
Texas Bar No. 24059920
**J. KYLE BEALE**, admitted *pro hac vice*
Texas Bar No. 24009892
440 Louisiana Street, Suite 2100
Houston, Texas 77002
Telephone: (713) 425-7100
Facsimile: (713) 425-7101

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of March, 2017, a true and correct copy of the foregoing instrument has been filed with the United States District Court for the Eastern District of Louisiana by electronic case filing/case management.   All Counsel of record are being served this filing by the Court's electronic filing system.


*/s/ Philip C. Hoffman*_____